# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

TONYA KING,

        Plaintiff,

v.                                      ACTION NO. 2:16cv610

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff, Tonya King ("King"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying King's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401–34.

An order of reference assigned this matter to the undersigned on December 28, 2016. ECF No. 9. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, the Court recommends that King's motion for summary judgment be DENIED, and the Commissioner's motion for summary judgment be GRANTED.

# I.  PROCEDURAL BACKGROUND

King protectively filed applications for a period of disability and DIB on August 16, 2010.  R. 12.[1]  On August 31, 2010, King protectively filed a Title XVI application for Supplemental Security Income ("SSI").  R. 12.  These claims were denied initially on November 9, 2010, upon reconsideration on June 8, 2011, and by Administrative Law Judge ("ALJ") O. Price Dodson in a decision dated March 19, 2012.  R. 12, 94–112.

On May 20, 2013, King filed applications for a period of disability and DIB that began on March 20, 2012; however, she later amended the alleged onset date of disability to February 7, 2013.  R. 12, 295–96.  King alleged disability based on the impairments of rheumatoid arthritis, thyroid disorder, hypertension, obesity, and sleep disturbance.  R. 238.  The Commissioner denied King's applications on September 4, 2013, and upon reconsideration on December 11, 2013.  R. 12, 156–66, 168–74.

At King's request, ALJ Stewart Goldstein heard the matter on August 3, 2015.  R. 28–63.  The ALJ received testimony from King (who was represented by counsel), and impartial vocational expert ("VE"), Linda Oggins.  R. 12, 28–63.  In a decision dated August 25, 2015, the ALJ denied King's claims, and found that she was not disabled from February 7, 2013 through December 31, 2014, the date last insured.  R. 9–23.

On August 18, 2016, the Appeals Council denied King's request for review of the ALJ's decision.  R. 1–6.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g)–(h), 1383(c)(3); 20 C.F.R. § 404.981.  Having exhausted all administrative remedies, King filed a complaint with

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

this Court on October 19, 2016.[2] ECF No. 3. The Commissioner answered on December 22, 2016. ECF No. 7. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on February 2, 2017 and March 6, 2017, respectively. ECF Nos. 11–12, 15–16. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II. FACTUAL BACKGROUND

### A. King's Background

Tonya King was born in 1964 and was 50 years old, which is defined as an individual closely approaching advanced age, on December 31, 2014, the date last insured. R. 22; 20 C.F.R. § 404.1563. King has a tenth grade education. R. 34. She previously worked as a convenience store clerk, grocery store cashier, and retail cashier at the substantial gainful activity level.[3] R. 35–37, 220–22, 228–31, 239–40.

On July 24, 2013, King completed an adult function questionnaire. R. 245–53. First, she noted personal care limitations. R. 246. Although King reported that she is able to feed herself, she wrote that she must sit down to dress, and that she has difficulty with bathing, toileting needs, and hair care. R. 246. King then described her limitations in meal preparation. She reported preparing her own meals every day, but noted that doing so took her "about an hour" and merely involved heating food in the oven with "not to[o] much looking after it." R. 247. Next, King noted difficulty with house work. R. 247. She noted that she could iron and clean laundry, but only if she sat down and even then, such work would take "a couple of hours." R.

---

[2] King initially filed the complaint against Carolyn Colvin; however, Ms. Colvin stepped down as Acting Commissioner on January 23, 2017. Nancy Berryhill became Acting Commissioner on January 23, 2017, and is substituted as the defendant in this suit.

[3] The Dictionary of Occupational Titles ("DOT"), code 211.462-010, classifies King's previous work as unskilled labor performed at the light exertional level, with a Specific Vocational Preparation ("SVP") of two. DOT 211.462-010, 1991 WL 671840 (4th ed. 1991).

247. Accordingly, she wrote that she does not do these tasks often and needs help to accomplish these chores. R. 247. She noted that she does not do yard work because she "live[s] in [a] midrise." R. 248. Additionally, King noted that she only shops for food once a month. R. 248. She wrote that doing so takes her approximately three hours, and that her daughter picks her up to get around because King does not have a driver's license. R. 248. Next, King noted that her only hobbies are reading and watching television, and she explained that her "eyes ha[ve] gotten a little bad." R. 249. King then wrote that she engages in social activities to include talking with others daily, going to Kingdom Hall church twice a week, and going to her daughter's house four times a week, but she noted that someone must accompany her when she visits these places. R. 249. In reference to changes in social activities since her ailments began, King noted that she "[c]an't do to[o] much standing or walking or taking care of [her]self." R. 250.

King also stated that she is unable to squat, bend, stand, walk, kneel, or climb stairs due to functional limitations in her knees. R. 250. King also attributed difficulty in performing these activities to swelling in her legs, weakness, and "reaching pain in elbow and hands." R. 250. Moreover, King noted that her condition affected her ability to lift, reach, sit, use her hands, complete tasks, and that her memory was also affected. R. 250. She noted that she is able to walk "maybe a block" before needing to stop and rest for a period of at least 15 minutes. R. 250. Notably, King indicated on the questionnaire that she needed to use a cane "everyday" and that the cane was prescribed by a doctor. R. 251.

### B. Relevant Medical Records

On March 22, 2012, King treated with Randall C. Fedro, M.D., and complained of arthritis in her knees and feet. R. 342. She exhibited no musculoskeletal edema or tenderness upon examination. R. 343. She followed up with Dr. Fedro on April 19, 2012, where she

exhibited swelling in her fingers, hands, and knees. R. 341. She had continued pain in her legs, and especially in her knees. R. 341. Dr. Fedro assessed arthralgia, bruising, and bilateral knee pain. R. 342. Her next meeting with Dr. Fedro was on May 10, 2012, where she once again exhibited swelling in her hands and feet, and arthritis in her hands. R. 340. She was positive for myalgias, back pain, and joint pain. R. 340. Dr. Fedro assessed arthritis, finger swelling, and elevated antinuclear antibody level. R. 341.

On July 18, 2012, King met with William W. Reed, M.D. R. 318–20. Dr. Reed noted that King's lumbar spine was tender, with reduced abduction and radiation of symptoms to the lateral thigh. R. 320. Otherwise, her spine was unremarkable on inspection, with normal range of motion, stability, and strength. R. 320. Her right knee was tender, but her gait was normal. R. 320. He stated that King "functions poorly most of the time in many activities of daily living." R. 319. He assessed that King's discomforts were characteristic of lumbar spondylosis with possible posterior ramus impingement. R. 320. He also assessed that myofascial strain may be present, appendicular osteoarthropathy was present, and that morbid obesity may contribute to these ailments. R. 320.

On July 19, 2012, King met with Dr. Fedro again to follow-up, and stated that she was about the same from her last visit. R. 339. She had myalgias, back pain, and joint pain, but her knees appeared to be less swollen. R. 339.

On August 6, 2012, DePaul Medical Center performed an MRI of King's spine that revealed the presence of several herniated discs, degenerative disc disease, and lumbar spondylosis with "nerve roots locally but likely impinging on descending left L4 nerve root near the root sleeve." R. 304–06.

King met with Dr. Fedro again on September 13, 2012, where she reported aches and

pains throughout her body. R. 338. She had myalgias, back pain, and joint pain. R. 338. She had tender cervical muscles and a tender right knee. R. 338. Her calves were not tender and she was negative for Homans sign. R. 338. Dr. Fedro assessed hypertension, hyperthyroidism, and arthritis. R. 339. At a follow-up appointment on October 25, 2012, Dr. Fedro assessed hypertension and hyperthyroidism. R. 337. On February 7, 2013, King reported that her aches and pains were getting worse. R. 336. She was once again positive for myalgias, back pain, and joint pain. R. 336. Dr. Fedro noted that she walks with a cane and that her finger joints exhibited swelling. R. 336. Dr. Fedro assessed arthritis, myalgia, insomnia, and hyperthyroidism. R. 336. Dr. Fedro wrote a "to whom it may concern" letter that day stating that King was unable to work. R. 377.

On September 5, 2013, King reported to Dr. Fedro with severe bilateral knee pain, lower back pain, hip pain, hand pain, and wrist pain. R. 363. Her hands would spasm and "lock up" on her frequently. R. 363. She stated that she would like to see Dr. Reed for more tests, but that she could not afford to do so. R. 363. She walked slowly and needed a cane. R. 364. Both wrists were swollen and tender, with a decreased range of motion. R. 364. Her knees were also tender. R. 364. Dr. Fedro assessed arthritis, hyperthyroidism, and hypertension. R. 364. That day, Dr. Fedro filled out a medical source statement reflecting King's limitations. R. 360.

On December 3, 2013, Sentara performed x-rays on King's knees, which revealed minimal marginal osteophytosis "consistent with early osteoarthritis" in her left knee. R. 376. No significant abnormalities were found with respect to her right knee. R. 376. Sentara also performed bilateral x-rays on her hands, which revealed "no significant bony or soft tissue abnormalities" with respect to either hand. R. 561.

On May 25, 2014, King presented to the emergency room at DePaul Medical Center with

bilateral knee pain and swelling. R. 382. The knee pain was noted to be a new problem that began two days before. R. 382. The pain was moderate, and included stiffness, but no numbness, no tingling, and no itching. R. 382. King had full range of motion. R. 382. Palpation to the bilateral knees did not cause pain. R. 384. King denied a decline in her gait or her activities of daily living. R. 399–400.

On July 31, 2014, Dr. Fedro noted that King's knee "still gives her a fit," but that Tramadol was helping. R. 405–06. He noted that her knee was swelling, but non-tender. R. 406. He assessed her with arthritis in her knee. R. 407.

On February 12, 2015, after King's date last insured, Dr. Fedro noted that King was moving much better than the last time he saw her, but also indicated a positive result for numbness. R. 462. On March 26, 2015, King returned to Dr. Fedro, who noted that she walked slowly with the aid of a cane. R. 451. Her lower back muscles were tender, as was her hip, especially with movement. R. 451. However, she was able to move it fully. R. 451.

On May 15, 2015, King presented to the emergency room with a cough, where she was negative for back pain. R. 477, 479. On examination, her muscle tone was normal and she had no edema or tenderness. R. 479. On June 11, 2015, King went back to the emergency room with right leg pain with tingling and numbness, and shortness of breath. R. 526–27. She walked to the bathroom with a cane, but was ambulatory and showed normal range of motion. R. 526, 529.

Although the record shows that King did not receive any surgery, injections, or physical therapy, the record establishes that King and her physicians frequently noted her lack of medical insurance or Medicaid, or otherwise remarked that she was unable to afford care or medication. R. 338, 340–341, 363, 406, 451, 459, 462, 468, 526.

## C. Medical Opinions and Residual Functional Capacity Assessments

On September 4, 2013, state agency physician Lewis Singer, M.D., completed a residual functional capacity assessment for King in conjunction with her disability claim. R. 122–25. Dr. Singer opined that King could perform light work. R. 124. He opined that because King's "cane was not prescribed or recommended by a doctor," her statements about her symptoms were not entirely credible. R. 122. He further stated that "[w]hile [King] may feel more secure using a cane, evidence does not support the need for an assistive device." R. 125. Dr. Singer opined that King could stand and/or walk about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. R. 122. Based on his evaluation, Dr. Singer opined that King was not disabled. R. 125.

On October 24, 2013, at the reconsideration level, another state agency physician, Richard Surrusco, M.D., conducted a residual functional capacity assessment. R. 134–36. Dr. Surrusco noted that King is able to ambulate independently with a cane. R. 135. Dr. Surrusco noted that King could cook, clean, bathe, and dress independently. R. 135. He opined that she could stand and/or walk for two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. R. 134.

On November 6, 2013, state agency medical reviewer Myron Watkins, M.D., from the Dallas disability quality branch, sent a request for corrective action to the Virginia Beach Quality Assurance Unit. R. 282. The request indicated that Dr. Watkins found "no imaging studies to substantiate severe [medically determinable impairments]" with respect to King's hands and knees, and directed laboratory or imaging studies of her hands and knees. R. 282–83. The request directed the state agency to re-evaluate King's claim for benefits in light of these imaging studies. R. 283.

On December 3, 2013, Sentara Healthcare performed radiographic imaging on King's knees that revealed no abnormalities in King's right knee and "minimal marginal osteophytosis . . . consistent with early osteoarthritis" in her left knee. R. 376. On December 10, 2013, Dr. Surrusco revised his RFC assessment based on the study of King's knees. R. 147–52. Most notably, Dr. Surrusco now opined that King could stand and/or walk for four hours in an eight-hour workday. R. 148. Dr. Surrusco noted that, although the imaging showed early osteoarthritis in one knee, the change was "minimal," King's hands were "normal," and she was able to hold her cane. R. 148. He opined that she could stand and/or walk for about four hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. R. 148. He further wrote that King is "able to stand, walk, and move about independently and . . . retains good use of [her] arms and hands." R. 151. Dr. Surrusco opined that King was not disabled. R. 151.

King's treating physician, Dr. Fedro, rendered two medical source statements in this case. R. 360, 377. The first is a letter addressed "to whom it may concern" and states that King was under his care from January 3, 2012 to February 7, 2013, the date of the letter. R. 377. The letter goes on to state that King "is unable to work in any capacity at this time. She has been referred to a specialist for her severe arthritis and muscle pains." R. 377. In Dr. Fedro's second medical source statement, dated September 5, 2013, he opines that King suffers from polyarthralgias, osteoarthritis in the knees and hands, and Graves' disease. R. 360. Through a series of check marks, Dr. Fedro then indicated that it is "medically necessary (or advisable) for [King] to stand and walk with a cane," that she could occasionally lift less than ten pounds, rarely lift ten pounds, and never lift more than ten pounds, that she could stand/walk for less than two hours in a typical workday, could sit for six hours in a typical workday, and would be absent

from work for more than four days a month due to pain. R. 360.

### D. Tonya King's Testimony

At the hearing before ALJ Stewart Goldstein on August 3, 2015, King testified to being in pain "all the time," specifically in her legs and back. R. 37–39. King testified that the pain radiates from the middle of her back all the way down her leg to her foot, and that this causes occasional numbness in her leg, foot, and toes. R. 38–39. She testified that she experiences this pain on a daily basis, and that she has lived with it for the past two to three years. R. 39. King stated that lying flat on her stomach provides "a little bit" of relief, but that otherwise she experiences this pain "all the time." R. 39. She then testified to only being able to stand for 10 to 15 minutes due to the pain, and that the pain does not improve with using medication. R. 40. King testified that her pain increases when she tries "to do too much and if [she] sit[s] too long." R. 41. She estimated that she would be able to walk for about 10 to 15 minutes before needing to stop because her leg would lock up, and that even with her cane the pain would become so unbearable she would have to "drag [her] leg." R. 42.

ALJ Goldstein asked King, "[i]f I ask you [to] stand up as long as you could stand at one time, you couldn't walk away, you couldn't sit down, but you could shuffle your feet all you wanted, how long do you think you could stand at one time?" R. 42. She answered "maybe about" 10 or 15 minutes due to her leg pain. R. 42. ALJ Goldstein then asked King:

> If I asked you to sit as long as you could in a chair like you're sitting in now, not like in a recliner . . . and you could shift all you wanted, but I wouldn't let you stand up, how long do you think you could sit before you'd have to get up?

R. 42–43. King responded that she could sit "maybe" 20 to 25 minutes due to her leg pain. R. 43. When ALJ Goldstein asked if King could recall a time when she could stand and walk more, King stated she did not have this much pain a "[c]ouple years back." R. 43. She also testified to

taking her medication as prescribed. R. 44.

ALJ Goldstein then asked King about her daily activities. R. 44. King testified that she generally uses the bathroom first before sitting in a chair in her bathroom to brush her teeth and wash her face due to the pain in her leg. R. 44. King stated that she would either sit or lay down for a while due to back and leg pain. R. 45. She testified that she tried to get the pain to ease up by lying on her stomach; if that worked, she would then try to get up and eat. R. 45. However, King indicated that sometimes she would be unable to get up due to the pain; in that case, she would lie down on her bed and watch television until physically able to get up. R. 45. She testified that she keeps her cane near her bed in case she needs to reach something when she is in bed. R. 47.

In reference to meal preparation, King testified that, if she is not in too much pain, she is able to prepare food like sandwiches or crackers, and possibly cook using her crock pot. R. 46–48. She testified that her children help her later in the afternoon. R. 48. King stated that she can do "a little laundry" sometimes, which involves placing clothes and laundry soap into her machine and turning it on. R. 48. She testified that she is unable to vacuum or mop. R. 48.

King testified that she is able to shop for groceries with assistance from her daughter. R. 48–49. King stated that she cannot finish the shopping on her own due to leg pain, so her daughter finishes for her. R. 49. King said that she goes to Kingdom Hall church twice a week if she is not in a lot of pain. R. 49. She testified that church involves sitting and listening, and that it is difficult for her to stand up with others in church. R. 49. King stated that if she is able to stand, she uses her cane or holds onto someone. R. 49. She testified to using her cane for the past three years, and that she needs it "all the time." R. 49–50. King stated the cane she currently uses was not prescribed, but that she needed it and spoke with her doctor about getting

"another one." R. 50. According to King, her doctor indicated that she needed insurance to get another one, so he told her to "[j]ust use the one you have." R. 50.

When ALJ Goldstein asked King if she visited family or friends outside her home, King answered, "[n]ot too much, no sir. If anything, they come see me." R. 50. King stated that she was able to hold her one-year old great grandchild for a few minutes, but that she could not carry him. R. 51. She testified that she does not babysit. R. 51. In reference to hobbies, King stated that she is still able to read, and that she reads the Bible and magazines. R. 51.

King testified that both of her knees bother her, but that her right knee is worse; although both of her knees "always" appeared swollen to her, she stated that her right knee is constantly swollen larger and is a constant source of pain. R. 51–53. King stated that, although she took prescription pain medications like Tramadol and Naproxen, her right knee is "getting worse" since she visited Dr. Fedro and the emergency room at DePaul hospital in 2014. R. 53. The questionnaire King completed supports this assertion. R. 252. King noted that Tramadol did not help her with her pain, Naproxen did not reduce her swelling, and Zolpidem caused nausea and strange dreams. R. 252. She testified that her lack of medical insurance prevented her from using referrals for specialty care. R. 53. The questionnaire also supports this testimony. R. 252. King wrote that she was unable to see an arthritis doctor because she does not have insurance. R. 252. King stated that she has issues with fatigue and feeling tired, and that her thyroid medication causes her weight to fluctuate. R. 53–54. When the ALJ asked King how much weight she could lift, she estimated "[m]aybe about 10 pounds, if that." R. 54.

### E.  Vocational Expert Testimony From Linda Oggins

Next, the ALJ heard testimony from VE Linda Oggins. R. 54–55. The VE testified that King would not be able to perform the jobs she previously held. R. 55–57. But the VE stated

that King would be able to perform other light jobs such as the work of a ticket taker, warehouse checker, or sorter. R. 57. The VE's conclusion was based on a hypothetical claimant who can stand and walk up to four hours in an eight-hour workday, can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. R. 56–57. The VE noted that such a claimant should also be able to perform more sedentary jobs like that of a document preparer, charge account clerk, or addressing clerk; however, the VE testified that King developed no skills that would transfer to work at the sedentary exertional level. R. 58. King's counsel then examined the VE. R. 59. He asked the VE:

> If we took a hypothetical worker, same age, education, and work experience as the claimant, limited to sedentary work, the worker would need a cane to stand and/or walk and the individual would, due to a combination of impairments, be absent from work an average of four days a month or more. Would that individual be able to do any full-time, sedentary employment or any other employment for that matter, in your opinion?

R. 59. The VE answered that there would be no full-time employment for such an individual. R. 59. Counsel then asked her to consider the actual limitations King testified to as a hypothetical. R. 59–60. The VE answered that none of the light jobs she discussed would be available. R. 59–60.

### III. THE ALJ's DECISION

To evaluate King's claim of disability[4], the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See*

---

[4] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of the Social Security Act, be under age sixty-five, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether King: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work; and (5) had an impairment that prevents engaging in any substantial gainful employment. R. 12–23.

On August 25, 2015, the ALJ found that King met the insured requirements of the Social Security Act through December 31, 2014, and she had not engaged in substantial gainful activity since her alleged onset date of February 7, 2013. R. 15, 23. At steps two and three, the ALJ found King had the following severe impairments: degenerative disc disease and spondylosis of the lumbar and thoracic spines, osteoarthritis of the knees and hands, obesity, hypothyroidism, and hypertension. R. 15. The ALJ found that these impairments did not singly or in combination meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as is required for a finding of disability at step three. R. 16 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ found that King's remaining impairments were non-severe, because "they did not exist for a continuous period of twelve months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional limitations." R. 16.

The ALJ next found that King possessed a residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 404.1567(b), with the exception that she could only stand and walk for four hours in an eight-hour workday. R. 16. The RFC determination also indicated that she could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch, or crawl; and must avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, and hazards.

R. 16. At step four of the analysis, the ALJ determined that King was unable to perform any past relevant work. R. 21. Finally, at step five, and after considering King's age, education, work experience, and RFC, the ALJ found that there were other jobs (such as ticket taker, warehouse checker, and sorter), existing in significant numbers in the national economy, which King could have performed. R. 22–23. Accordingly, the ALJ concluded that King was not under a disability from February 7, 2013, the alleged onset date, through December 31, 2014, the date last insured, and was ineligible for a period of disability or DIB. R. 23.

## IV. STANDARD OF REVIEW

In reviewing a decision denying benefits, this Court will "uphold the [Commissioner's] determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by

substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate when either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.   ANALYSIS

King asserts that the ALJ committed reversible error because (1) his RFC determination was not supported by substantial evidence and contrary to the medical record; (2) he violated the Fourth Circuit's *Albright* rule; and (3) his RFC determination included no limitations corresponding to the osteoarthritis in King's hands.

### A. The ALJ properly assessed the medical opinion evidence in crafting the RFC.

King argues that the ALJ erred in his RFC determination by determining that King can perform light work and does not require the use of a cane. ECF No. 12 at 5–8. According to King, "Dr. Fedro, Dr. Watkins, and Dr. Surrusco (in his first opinion), all agreed Ms. King is limited to a sedentary RFC plus the need to use a cane." *Id.* at 5. King argues that the ALJ gave no reason for rejecting Dr. Watkins' opinion, and gave no supportable reason for rejecting Dr. Fedro's opinion and Dr. Surrusco's initial opinion. *Id.*

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ then uses that RFC to determine whether a claimant can perform her past relevant work. 20 C.F.R. § 404.1545(a)(5). The RFC

determination is based upon a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3).

Included in the regulations is the command that the ALJ "will evaluate every medical opinion" presented to him, "[r]egardless of its source." 20 C.F.R. § 404.1527(c).[5] Medical opinions are defined in the regulation as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Accordingly, the ALJ must evaluate every medical opinion, explain what weight he assigns to it, and provide his reasons for assigning such weight. *See Lewis v. Berryhill*, 858 F.3d 858, 867–68 (4th Cir. 2017) (remanding because the ALJ did not explain why he failed to give the opinion of a treating physician controlling weight). Under the regulations and Fourth Circuit authority, a treating physician's opinion merits "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The Court begins, as King does, with Dr. Watkins. King is correct that the ALJ provided no reason for rejecting Dr. Watkins' opinion, but that is because Dr. Watkins never offered an opinion about King's limitations. Dr. Watkins was not the state agency medical consultant at the initial level, as King claims. Rather, the role King attributes to Dr. Watkins was actually performed by Dr. Singer. Dr. Watkins' role was to review Dr. Surrusco's first RFC evaluation as

---

[5] The regulations have recently been amended, but the rules of section 1527 still apply to claims, such as King's, that were filed prior to March 27, 2017. *See* 20 C.F.R. § 404.1527.

part of the SSA's office of quality review. *See* R. 282.

King erroneously states that "Dr. Watkins did the initial review, finding Ms. King limited to a sedentary RFC plus the need to use a cane. Tr. 118-25." ECF No. 12 at 4. Dr. Watkins' name appears nowhere in the record pages cited by King, which is in fact Dr. Singer's initial review. *See* R. 123, 125. More problematic for King, is that Dr. Singer did not limit her to "a sedentary RFC plus the need to use a cane," as she claims. Dr. Singer's personalized disability explanation states, "[w]hile you may feel more secure using a cane, evidence does not support the need for an assistive device." R. 125.[6] Dr. Singer also found that King "demonstrates the maximum sustained work capability for" light work. R. 124. King is correct that the ALJ attributed little weight to this assessment without explanation, but the ALJ's RFC is actually more favorable to King than Dr. Singer's. For example, Dr. Singer opined that King can stand and/or walk for six hours in an eight-hour workday, while the ALJ limited King to four hours of standing and/or walking. R. 16, 122. Accordingly, the fact that the ALJ did not provide a detailed explanation for why he attributed little weight to Dr. Singer's opinion does no harm to King's position. *See Bennett v. Colvin*, No. 2:13cv189, 2014 WL 1603737, at *8 (E.D. Va. Apr. 21, 2014) ("Unless the claimant seeking reversal of an adverse decision can prove that an error materially affected the outcome of the case, the prior decision should be affirmed) (quoting *Alexander v. Astrue*, 5:09cv432, 2010 WL 4668312, at *3 (E.D.N.C. Nov. 5, 2010) (the "party attacking the agency's decision bears the burden of establishing that the alleged error was prejudicial")).

Turning to Dr. Fedro, King's treating physician, the ALJ considered the opinions offered

---

[6] In Dr. Singer's credibility assessment, he notes that King "reported to her doctor that she ambulates with a cane because it's easier. However, [the] cane was not prescribed or recommended by [a] doctor." R. 122. Dr. Singer then found King's statements about her symptoms to be "not entirely credible." *Id.*

by Dr. Fedro in his medical source statement and letter, R. 360, 377, and found them unsupported by the objective medical evidence. Importantly, the opinions that King relies upon are not a medical record prepared for King's treatment, but a check-the-box form prepared to support her claim of disability, and a letter opining that she is disabled, without further detail. R. 360. *See Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3 (E.D. Va. Apr. 2, 2015) (noting a "distaste . . . for medical reports that do not contain at least a minimal amount of written explanation"). "Such check-the-box forms, unaccompanied by explanations are weak evidence at best, and not entitled to great weight even when completed by a treating physician." *Id.* at *12 (citing *McConnell v. Colvin*, 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013)); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). However, because Dr. Fedro is a treating physician, "whose treatment notes and medical records regarding [King] are in the record," the ALJ may not summarily dismiss the opinion merely because this form itself contained no elaboration. *See Forehand v. Astrue*, No. 4:11cv58, 2012 WL 3912760, at *8 (E.D. Va. Sept. 7, 2012).

Here, the ALJ noted that "Dr. Fedro did not provide additional explanation for his assessments," but the ALJ also provided further explanation for discounting Dr. Fedro's opinions. R. 21. The ALJ noted that the physical examinations contained in the record did not show muscle weakness and muscle spasms, which seemed to the ALJ to be the basis of some of Dr. Fedro's opinions. R. 21. The ALJ further referenced the diagnostic studies, stating that the x-rays demonstrated no osteoarthritis of the hands,[7] and only limited changes in King's knees. R. 21. These limited changes were the same as those acknowledged by Dr. Surrusco in his second opinion, after receiving the bilateral x-rays of King's knees. R. 147–52.

---

[7] Nevertheless, the ALJ did find that King suffered from the severe impairment of osteoarthritis of the hands. R. 15. The Court will further address this issue in Part V.C.

The ALJ also noted that Dr. Fedro's assessment that King is disabled is an issue reserved for the Commissioner. R. 21. Because the task of making disability determinations is assigned to the Commissioner, "the medical findings and other evidence" supporting such statements will be considered by the Commissioner, but a treating physician's opinion that a claimant is disabled and unable to work neither controls nor is accorded "special significance" by the SSA. 20 C.F.R. § 404.1527(d)(1), (d)(3). Dr. Fedro's February 7, 2013 "to whom it may concern" letter states that King "is unable to work in any capacity at this time. She has been referred to a specialist for her severe arthritis and muscle pains." R. 377. It states nothing else about King's limitations. As the regulations state, such a bare assertion of disability is not accorded special significance by the Commissioner. Ultimately, the ALJ concluded that "neither the clinical examinations nor the diagnostic studies" were consistent with Dr. Fedro's opinion. R. 21.

King argues that the ALJ and Dr. Surrusco's rejection of a cane requirement was erroneously based solely on King's knees, rather than her combined impairments, including her back. ECF No. 12 at 6–7. However, this argument reveals added problems with Dr. Fedro's medical source opinion. Dr. Fedro is the physician opining that it is medically necessary or advisable for King to use a cane, but Dr. Fedro never elaborates on which conditions specifically cause her to need a cane. R. 360. Dr. Fedro does list King's medical conditions, and it is logical to assume that Dr. Fedro would base his cane opinion on those medical conditions. Dr. Fedro notes that King suffers from osteoarthritis of the knees, but does not note any disabling condition with respect to King's back. R. 360. Neither Dr. Fedro, nor King, point to anything in the record that connects King's cane use to her lumbar condition.[8]

---

[8] King cites the record at pages 304–06. This MRI, dated August 6, 2012, does indicate that King suffers from mild disc bulge and spondylosis at L5-S1, L4-L5, and L3-L4, but it does not connect these issues to cane use. R. 304–06.

Even so, the ALJ actually considered King's back pain in connection with her cane usage. He noted that physical examination showed King to have a full range of motion of her back, and that Dr. Reed noted that her back was generally unremarkable with regard to range of motion, stability, and strength. R. 18. The ALJ further noted that, "[i]n terms of [King's] degenerative disc disease and spondylosis of the lumbar and thoracic spines, the medical evidence of record . . . does not support the extent of [King's] alleged symptoms and limitations." R. 18. The ALJ noted that King received routine or conservative treatment, and had never "sought, nor required, epidural injections, physical therapy, surgery, or a TENS unit." R. 18. Nor did she receive treatment from a specialist for her back disorders. R. 18. The ALJ also stated that King did not typically report back pain during emergency room visits, as she did with knee pain. R. 18. The ALJ determined that limiting King to standing or walking for four hours reflected the limitations arising from her back condition, and that a further cane limitation was not necessary. R. 18.

Finally, the Court turns to the ALJ's treatment of Dr. Surrusco's opinions. The ALJ stated that he gave substantial weight to Dr. Surrusco's second opinion, and that he considered but attributed limited weight to Dr. Surrusco's first opinion. R. 20. The ALJ stated that Dr. Surrusco's second opinion came after review of bilateral x-rays of King's knees and hands, which revealed only mild findings. R. 20–21. Thus, the ALJ reasoned that Dr. Surrusco's first assessment was not based on the record as a whole, and his later opinion based on the updated medical evidence was entitled to more weight. R. 20–21.

This is an eminently reasonable assessment for the ALJ to make. The SSA's office of quality review, through Dr. Watkins, had previously rejected Dr. Surrusco's first opinion because it was not based on sufficient medical evidence. After obtaining more evidence, Dr. Surrusco

reconsidered his opinion of King's limitations. The Court declines to hold that the ALJ should have attributed great weight to a medical opinion which was later modified by the opining doctor after review of updated medical information.

King argues that the ALJ's reasoning that King did not require use of a cane because it was never medically prescribed was not a supportable basis for rejecting the cane. ECF No. 12 at 7. If this were the sole reason for rejecting the use of a cane, the Court may be inclined to agree. However, as discussed above, this is but one reason among many, and the Court is satisfied that the ALJ adequately assessed the medical evidence and opinions related to King's cane usage and her RFC assessment. Despite King's claim that three doctors all agreed that King requires the use of a cane, the truth is that only Dr. Fedro maintained that opinion as of the ALJ's decision. The ALJ explained his reasoning in giving Dr. Fedro's opinion little weight, with appropriate reference to the objective medical evidence, and thus the ALJ did not err in his treatment of the medical opinion evidence.

**B.  *The ALJ properly considered the prior ALJ's decision in accordance with the* Albright Rule.**

Plaintiff argues that the ALJ violated the rule articulated by the Fourth Circuit in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). *Albright* governs how an ALJ should treat a previous ALJ's opinion when faced with a successive application alleging an unadjudicated period of disability. The Fourth Circuit stated in *Lively v. Sec. Health & Human Servs.,* 820 F.2d 1391, 1392 (4th Cir. 1987) that "[i]t is by now well-established that fundamental and familiar principles of *res judicata* apply in Social Security disability cases." However, decisions by the SSA do not have preclusive effect over claims filed by identical claimants for unadjudicated time periods. *Albright,* 174 F.3d at 476 ("'*[r]es judicata* bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one

became disabled in 1994'") (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)).

In *Lively*, the SSA determined that Lively, who was under 55 at the time, was capable of performing light work, and was not disabled. *Lively*, 820 F.2d at 1391–92. Upon attaining the age of 55 mere weeks after the ALJ's decision, Lively reapplied for benefits, because the SSA's grid rules provide that persons 55 and older, classified as of advanced age, are disabled when they can perform no more than light work. *Id.* at 1392; 20 C.F.R. Pt. 404, Subpt. P, App. 2. The second ALJ, with no discussion of the first ALJ's decision, determined that Lively could perform work at any exertional level, and was therefore not disabled. *Lively*, 820 F.2d at 1392. The Fourth Circuit reversed and remanded, stating that "[i]t is utterly inconceivable that [Lively's] condition had so improved in two weeks as to enable him to perform medium work," and "the Secretary must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently" to reject a prior finding. *Id.*

In *Albright*, the Fourth Circuit explained that *Lively* is less an illustration of the *res judicata* principle, but rather "is . . . best understood as a practical illustration of the substantial evidence rule." *Albright*, 174 F.3d at 477. The Fourth Circuit went on to explain that, "[a]lthough we might state with some assurance that a claimant's condition very likely remains unchanged within a discrete two-week period, we would grow ever less confident as the timeframe expands. Where, as [in Albright's case], the relevant period exceeds three years, our swagger becomes barely discernible." *Id.*

"Distilling the Fourth Circuit's holdings in *Lively* and *Albright* to a practical and readily applicable standard," *Farrar v. Astrue*, No. 3:11cv457, 2012 WL 3113159, at *9 (E.D. Va. July 13, 2012), the SSA issued Acquiescence Ruling 00-1(4) on *Albright*, 65 Fed. Reg. 1936-01, 1938, 2000 WL 17162 (Jan. 12, 2000) [hereinafter AR 00-1(4)]. Under *Albright* and its

associated acquiescence ruling, the ALJ must consider the prior findings from a final decision as evidence and give them "appropriate weight in light of all relevant facts and circumstances." AR 00-1(4), 65 Fed. Reg. at 1938. In affording weight to a prior finding, the ALJ must consider the following factors:

(1) Whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition;

(2) The likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and

(3) The extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

*Id.* "Prior findings about facts such as a claimant's RFC or the severity of an impairment generally deserve less weight as the timeframe between claims increases." *Johnson v. Colvin*, 3:15cv296, 2016 WL 626378, at *3 (E.D. Va. Jan. 27, 2016). "An ALJ does not necessarily have to walk through each factor in order to comply with AR 00-1(4); rather, reviewing and evaluating all the evidence presented at the correct standard complies with the acquiescence ruling." *Grant v. Colvin*, No. 4:12cv191, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014) (citing *Melvin v. Astrue*, 602 F. Supp. 2d 694, 702 (E.D.N.C. 2009)).

In this case, ALJ Goldstein attributed significant weight to ALJ Dodson's prior decision. R. 13. He reasoned that the medical record did "not reveal extensive, sustained medical treatment since 2012," the year of the prior ALJ's decision. R. 13. Rather, the medical evidence demonstrated "only occasional emergency room visits and only occasional follow-up visits with [Dr. Fedro]." R. 13. For these reasons, the ALJ stated that he would not reduce the RFC offered by Dr. Surrusco, which "generally comports" with the RFC offered by the prior ALJ. R. 13.

In the prior ALJ decision, ALJ Dodson found that King suffered from the severe impairments of Grave's disease (a form of hyperthyroidism), hypertension, obesity, and early chondromalacia. R. 100. He then produced an RFC which limited King to standing and walking for four hours in an eight-hour workday. R. 102. The RFC also stated that King "must avoid climbing ladders" and can bend, stoop, and crouch no more than occasionally. R. 102.

As King points out, ALJ Goldstein found different severe impairments at step two, determining that King suffered from the severe impairments of degenerative disc disease and spondylosis of the lumbar and thoracic spines, osteoarthritis of the knees and hands, obesity, hypothyroidism, and hypertension. R. 15. ALJ Goldstein's RFC included the same limitations as the RFC articulated by ALJ Dodson, with the added limitations that King can only occasionally balance, kneel, and crawl, and must avoid "concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, and hazards." R. 16.

King argues that, because ALJ Goldstein found additional severe impairments, the RFC must reflect greater limitations than the RFC from the prior ALJ's decision. ECF No. 12 at 9. This is not what *Albright* requires. *Albright* requires the ALJ to give the prior decision the weight it deserves and to consider it as evidence, which is exactly what the ALJ did in this case. He explained the weight given to ALJ Dodson's opinion and explained the reasoning why that opinion was entitled to such weight. R. 13.

This Court previously considered, and rejected, King's argument in *Grant*, No. 4:12cv191, 2014 WL 852080, at *7–8. Quoting the argument from Grant's brief, stated using the exact same language King uses in her brief here, ECF No. 12 at 9, this Court in *Grant* explained that such an argument "looks logical on its face, [but] does not square with Fourth Circuit precedent . . . [and] is simply incorrect." *Grant*, No. 4:12cv191, 2014 WL 852080, at *7.

As the Court explained, "[a]n ALJ could find medical worsening or a new severe condition at step two, and still be able to assess a functionally equivalent RFC, if the medical worsening does not alter that individual's functional ability." *Id.* at \*8. In *Grant*, the second ALJ determined that the claimant had a severe knee disorder at step two that was not considered a severe impairment in the original decision. *Id.* The second ALJ nonetheless articulated the same RFC as the prior decision, explaining his reasons for doing so. *Id.* The Court concluded that the ALJ committed no error. *Id.*

It is true that the ALJ found King suffers from the severe impairment of degenerative disc disease and spondylosis of the lumbar and thoracic spines. R. 15. However, the ALJ also explained why those conditions do not result in a more substantial change to her RFC.[9] For example, the ALJ noted the August 6, 2012 MRI of King's back, but explained that King's treatment for her back disorders were "routine and/or conservative in nature," and that King never sought or required epidural injections, physical therapy, surgery, or a TENS unit. R. 18. Further, the ALJ explained that, while Dr. Reed noted that King's lumbar spine was tender and had reduced abduction, he also indicated that it was unremarkable on inspection with respect to palpation, range of motion, stability, and strength. R. 18, 320. King never followed up with Dr. Reed after the MRI, though this appears to be related to her insurance situation. R. 526.

The ALJ examined King's record of treatment at the emergency room, and found that she typically did not report back pain during those visits. R. 18. Specifically, the ALJ pointed to King's May 25, 2014 emergency room visit at DePaul Medical Center, where she reported knee pain, but not back pain, R. 382; her July 31, 2014 visit with Dr. Fedro where she reported knee problems, but not back pain, R. 405–07; and her December 6, 2014 visit to DePaul Medical

---

[9] The fact that the ALJ provided this explanation separate from his discussion of *Albright* is irrelevant. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (stating that "the ALJ need only review medical evidence once in his decision").

Center, where she complained of leg pain, but not back pain, R. 422. R. 18. The ALJ noted that throughout these visits, King had a normal musculature range of motion. R. 18–19.

The ALJ even examined the evidence after the date of last insured, specifically King's March 27, 2015 visit with Dr. Fedro where King reported numbness in her hip and leg, but had no weakness or atrophy, R. 451; King's May 15, 2015 emergency room visit where King had no edema or tenderness with normal muscle tone and normal coordination, R. 479; and King's June 11, 2015 emergency room visit where she had a normal range of motion with no back tenderness, R. 529. R. 19.

The ALJ explained that the RFC limitation of light work and of standing and walking for four hours in an eight-hour workday adequately accounts for the limiting effects of King's back disorders. R. 18. Accordingly, while the ALJ found additional severe impairments at step two of the analysis, he adequately explained why those impairments did not substantially alter the prior RFC determination. *Albright* does not require more. *See Grant*, 4:12cv191, 2014 WL 852080, at *7–8.

The ALJ also considered the December 3, 2013 x-rays performed on King's knees. R. 19, 376. The ALJ echoed Dr. Surrusco in noting the mild nature of the findings. R. 19, 148. Once again, the ALJ noted the conservative treatment that King received. R. 19. The ALJ further supported his decision with evidence that King has a full range of motion in her knees, and that, on numerous occasions, palpation of King's bilateral knees produced no painful response. R. 19. Nevertheless, the RFC includes additional limitations, such as only occasional crawling and kneeling, which account for King's knee pain. R. 16.

The ALJ did not violate *Albright* in this case. He considered the findings of the prior ALJ and the evidence that King's condition had deteriorated, explained the weight given to the

prior ALJ's decision and King's evidence, and fashioned an RFC accordingly. Nothing in *Albright* states that, if the ALJ finds an additional severe impairment that was found non-severe in a prior ALJ decision, then he must alter the RFC.[10] Rather, "ALJs are required to look at the whole record and the whole person when determining RFC[s]; there is not simply a calculation that if there are more serious impairments, the RFC will be more restrictive." *Grant*, 4:12cv191, 2014 WL 852080, at *8. The ALJ's decision is supported by substantial evidence.

### C. The ALJ properly accounted for the osteoarthritis in King's hands.

Finally, King argues that the ALJ erred by not including functional limitations in the RFC related to the osteoarthritis in her hands, which the ALJ determined to be a severe impairment. ECF No. 12 at 10–11. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as walking, standing, pushing, pulling, understanding instructions, responding appropriately to usual work situations, and the like. 20 C.F.R. § 404.1522(b). King argues that, because a severe impairment by definition limits one's ability to do basic work activities, every severe impairment should have a related limitation in the RFC. The Commissioner argues that the step two severity inquiry is only a threshold matter, and does not necessarily lead to RFC limitations.

The Court agrees with the Commissioner. *See McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected."); *Little v. Colvin*, No. 6:15cv11, 2016 WL 4446325, at *4 (W.D. Va. Aug. 2, 2016) (same). As the Fourth Circuit has stated, an impairment is only "not severe" if "it is a *slight abnormality* which has . . . a *minimal effect* on the individual." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). "The ALJ's finding that the plaintiff suffered from severe

---

[10] In any case, the ALJ did add additional limitations to King's RFC.

impairments is not tantamount to a conclusion that these impairments imposed significant work-related limitations." *Walters v. Barnhart*, 184 F. Supp. 2d 1178, 1184 (M.D. Ala. 2001). "[T]here is no contradiction in classifying an impairment as 'severe' but determining that symptoms associated therewith are mild based on the overall record." *Felton-Miller v. Astrue*, No. 2:10cv5, 2010 WL 4809030, at *11 (E.D.N.C. Oct. 4, 2010).

Specifically, King argues that her osteoarthritis should have resulted in an RFC limitation in hand usage, such as handling, fingering, or grip strength. ECF No. 12 at 11. Neither Dr. Singer nor Dr. Surrusco opined that King has limitations in handling, fingering, or grip strength, or any other manipulative limitations. *See* R. 123, 135, 148. Dr. Surrusco specifically noted in his second opinion that King retained good use of her arms and hands. R. 151. Not even Dr. Fedro, despite stating that King has osteoarthritis in her hands, opined that she has limitations with respect to handling, fingering, or grip strength. R. 360. King's argument that the ALJ should have found a limitation where none of the doctors in the case found one is unavailing.

The ALJ explained why King's osteoarthritis did not result in additional limitations in her RFC. R. 19–20. The ALJ explained that, while King's finger joints appeared swollen upon examination on February 16, 2012 and February 7, 2013, she had full range of motion in her fingers. R. 19. He also noted that the medical record, including Dr. Fedro's progress notes, failed to confirm that King suffered from frequent hand spasms. R. 20. The December 3, 2013 x-ray on King's hands revealed no abnormalities with respect to either of King's hands. R. 561. Finally, the ALJ noted a number of occasions where King went to the hospital but did not report any issues related to her hands. R. 20.

Accordingly, the Court finds that the ALJ's determination regarding King's osteoarthritis is supported by substantial evidence.

## VI.    RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment be DENIED, and defendant's motion for summary judgment be GRANTED.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask /s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 19, 2017